UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF NEW YORK
**NOT FOR PUBLICATION**
-----------------------------------------------------------------
In re

John L. Russo, Individually and as sole
shareholder of CustomSignatureStamps.com Inc.          Case No. 10-11576 K

Debtor
-----------------------------------------------------------------
American Legal Commercial Printers, Inc.
 Douglas J. Russo

Plaintiff

            -vs-                                       AP No. 10-1110 K

John L. Russo
                        Defendant
-----------------------------------------------------------------


E. Robert Fussell, Esq.
46 Wolcott Street, Suite One
LeRoy, New York   14482

Attorney for Plaintiffs/Creditors American Legal,
Commercial Printers, Inc. and Douglas J. Russo


Charles J. Marchese, Esq.
Gleichenhaus, Marchese & Weishaar, P.C.
930 Convention Tower
43 Court Street
Buffalo, New York   14202

Attorney for Defendant/Debtor John L. Russo

DECISION AFTER TRIAL; OPINION AND ORDER

INTRODUCTION

It is relatively rare that family transactions are challenged in this Court from <u>within</u> the family.  Usually they are challenged by a trustee, a creditor, or a former spouse.  That is not to say that this case is unique.  In one case that came before the Court, a sister and brother had been business partners, and the brother's bankruptcy resulted in a 11 U.S.C. § 523(a)(4) dischargeability action by the sister against the brother.  And when, in other cases, a family transaction is challenged by a trustee, a creditor, or a former spouse, it is very common that a family becomes internally contentious.

This case is unusual in this Court because it is a Chapter 13 case in which the Debtor is an elderly father, and the Plaintiffs are the corporation he formed, and his son, seeking to determine that the Debtor's discharge should exclude more than $700,000 of debt allegedly owed to the Plaintiff corporation  and the Plaintiff son.

The Court finds that the Debtor culpably absconded with $362,760.45 of corporate funds while under a fiduciary duty to the corporate Plaintiff; that Plaintiff, Douglas Russo owns 95% of the corporation; and that the debt to the corporate Plaintiff is non-dischargeable under 11 U.S.C. § 523(a)(4).   Some other claims by the Plaintiffs are dismissed, and others will not be decided at this time.

A.  Initial Findings of Fact

1.  In 1991, the Debtor, John Russo, established a Subchapter S corporation named American Legal and Commercial Printers, Inc. (hereinafter referred to as "American").

2.  The Debtor had previous successful experience in the printing business, and was an investor in commodities markets, and an investment advisor, and he thought that a custom printing shop with walk-in photocopy services would provide an investment opportunity for himself, and a livelihood (and investment opportunity) for his two sons Brian and Douglas. (Desktop printing had not yet burgeoned in 1991.)

3.  The corporate binder for American reflected that the Debtor was the sole promoter, director, officer, and shareholder.  Now, twenty years later, nothing has ever been recorded in the corporate binder since the corporation was formed.  No minutes, no resolutions, no amendments to the corporate records, no substitutions of officers, no issuance of additional shares of stock, and no stock transfers.  (The Debtor was the corporate secretary.  Maintenance of American's corporate records was his responsibility [Plaintiff's Exhibit 3-1].)

4.  However, New York Law does not make the corporate books and records dispositive as to certain issues of fact that might arise among shareholders or between shareholders and the corporation.  See part D.(1)(b) below.  Consequently, the Findings of Fact set forth below are based on the facts adduced at trial.  The corporate binder is given no weight except to the extent that the Debtor relies upon certain matters of corporate governance that are not reflected in the binder that he, as secretary, had the privilege and duty to maintain.  As to those matters, his failure to maintain the records will work against him.  Importantly (for

example), John seeks to avoid estoppel as to American's tax returns because Douglas was

president and has signed the corporate return for years.  John caused that.  John may not take

comfort in the fact that he never recorded the change in ownership or officers.  John was the

president in the corporate binder.  Douglas, on the other hand, is not found in the binder.  Finding

# 4 is that Douglas was president as of some point in 1999 and has properly caused suit by

American against John.  This will be more fully addressed below.

      5.  When the corporation was established in 1991, John Russo made his son Brian

the president of the corporation; Plaintiff Douglas Russo became the vice-president; and the

Debtor retained the titles of secretary and treasurer.  Further, John issued stock certificates by

which Brian Russo owned 50% of the stock of the corporation and Douglas Russo owned 45% of

the stock of the corporation, leaving the Debtor with 5% of the stock of the corporation.  (Again,

none of these facts were recorded in the corporate binder, but the Debtor does not dispute those

particular facts.)  This Court finds, as discussed in part D.(1)(b) below, that John caused Douglas

to become 95% owner of American.

      6.  From 1991 to 1993, Plaintiff Douglas Russo worked only part-time at

American because he was completing his Bachelor's Degree in Printing Management and Sciences

at Rochester Institute of Technology.  His older brother Brian had a high school education and

some college courses and began full-time work right away for the company in 1991.

      7.  From 1993 until March 1999, president Brian handled sales, the

secretary/treasurer Debtor handled all company finances, and vice-president Douglas devoted all

his time to print production.

8.  In March, 1999, Brian and Douglas had a falling out, and Brian left the company.

9.  The Debtor then advised Douglas that Brian was transferring all of his 50% ownership in American to Douglas (Douglas already owned 45%), that Douglas was replacing Brian as president, and Brian would receive a severance package.[1]

10.  After Brian left, Douglas considered leaving too.  However (according to Douglas) his father convinced him to stay, contending that <u>John</u> was building up a nest egg for <u>Douglas</u>, primarily in a <u>corporate</u> (American Legal, Corp.) investment account at Solomon Smith Barney brokerage in Batavia, and that <u>Douglas</u> would be able to retire at a young age if he stayed at the company.

11.  American's tax accountant was Joan Barton, who testified at trial.  She was also the tax preparer for John, Brian and Douglas.  After Brian's departure, the Debtor, John, informed her of the change in <u>ownership</u> and <u>officers</u> so that she could properly reflect these on the tax documents that she prepared for the corporate and individual returns.  95% ownership for Douglas and 5% for the Debtor.  Douglas had become president.  Brian had cashed out. Subsequent returns reflected these changes ever since.  The Court finds that her testimony was honest and true.  Importantly, John did not complain of the fact that in years in which American reported a "loss," his share of the loss would have been higher (in other words, his proper

---

[1]The record is curiously devoid of any mention of the family meetings that must have attended such events. Arguably, those were informal shareholder/board meetings resulting in "resolutions," and all should have been recorded as such.  (This writer had childhood and adolescent experience in such a family corporation and remembers the loud voices in the kitchen.)

deductions would have been higher) if he had insisted to the Internal Revenue Service that he owned 55% of American, rather than 5%. [See finding # 23, et seq., below.]

12.   After Douglas became president of the corporation in 1999, John Russo began signing Douglas Russo's name (usually imitating Douglas' signature) to the corporate checks even though John Russo was a signatory on the corporate checking accounts and could have signed his own name.  John has never explained this satisfactorily.[2]  Douglas Russo denies having knowledge of this fact until after his father stopped taking care of the corporate finances in July of 2006.  The Debtor argues that this testimony is patently incredible because several other witnesses who were called by the Plaintiff testified to their observation of the practice of John signing Douglas' name on checks, and for other reasons discussed below.

13.   The Court does, indeed, find that John Russo's signing of his son's signature on corporate checks (and even imitating his son's signature) on a regular basis was not surreptitious.  However, each of the several witnesses who testified to having seen John Russo affix Douglas Russo's signature on corporate checks also attested that they never mentioned it to Douglas because they felt that whatever understandings might exist between the father and the son were none of the witnesses' business.  Moreover, Douglas testified that his "forged" signature did not appear on his own pay checks; rather, those checks were signed by John with John's own name, or left blank for Douglas to sign, or deposited into Douglas' personal bank account by John or office staff, sight-unseen by Douglas.

_____

[2]The Debtor's pre-trial deposition in this regard is discussed later.  It seems that he wanted banks and others to believe that Douglas was "in charge," so to speak.  See text accompanying footnote 21 below.

14.  It is clear to the Court that Douglas would have known of his father's practice of signing (even imitating) Douglas' signature on corporate checks had he cared to look, especially when he would open the mail in his father's absence and would have had the opportunity to see the cancelled corporate checks.  For this reason and other reasons to be explained below, the Court will rule in favor of the Debtor with regard to numerous particular disbursements by John Russo by check from the corporate checking accounts, whether he signed his own name or Douglas' name.  (This is not the Court's holding as to some documents that were not checks, as explained below.  E.g., Several witnesses testified that John told them such things as "Douglas just took out a loan and doesn't know it."  Or "Brian just got a loan and doesn't know it." The loan documents are a different matter.)

15.  From the time that Brian left the business in 1999 until late 2005,  Douglas worked sixty or more hours per week, took a very small salary of about $15,000 per year,[3] and, from Douglas' perspective (as the individual who prepared the estimates for each printing job based upon his knowledge of costs, etc.)  the business was doing well, netting about $4500 per month.  There is no documentary evidence of this, however.[4]  Although the tax returns generally reflected losses, it is the experience of this Court that closely-held corporations that were never audited (or subject to audit) say what their owners want them to say in tax returns.  In this case,

---

[3]Douglas also received the benefit of some of the "forged" checks, such as for car payments.  Although he might have learned of the "forgeries" as to these only after the Debtor left American, he does not complain of those particular "forgeries" now, as discussed below.

[4]Moreover, there is no evidence that Douglas had any knowledge of corporate overhead such as payroll, taxes or debt-service.  And losses were reported to the I.R.S. as follows:   2001  - ($6284); 2002 - ($36,367); 2003 - ($58,507); 2004 - ($22,852); 2005 - ($3861).

Ms. Barton relied exclusively upon information provided to her by the Debtor.  The Court binds

the Debtor to those tax returns for important purposes, and also accepts the reported losses.[5]

Finding 15-A.  The Debtor, John Russo, caused American consistently to report

that Douglas owned 95% of American, to the Internal Revenue Service.

16.  In late 2005, Douglas found that his father was behaving erratically, causing

morale problems with staff, and potentially disrupting relationships with some customers.

Douglas asked his father to stop coming in on a daily basis and to come in only two or three times

a week to handle the finances.  John did so reduce his hours at the office.[6]

17.  In mid 2006, the erratic behavior increased, from Douglas' point of view, and

Douglas asked John to leave the company permanently, which John did in July of 2006.[7]

18.  Douglas began to examine the corporate finances, and asked John for certain

documents.

19.  Douglas went to the office of Solomon Smith Barney and spoke to an officer

who informed him that American's corporate investment account had been closed five years

before (in 2001) and that all its assets had been transferred to the account of a business named

Tantamount, owned exclusively by the Debtor.  (It was later learned that Tantamount was a *de

jure* Nevada corporation.)

---

[5]Although Douglas signed the corporate returns, the Debtor was sole provider of information to the tax accountant, and signed his own returns that were consistent with the corporate returns.

[6]See footnote 1 above regarding the curious absence of evidence regarding family meetings about such a major event.

[7]Id.

20.   When John did not comply with Douglas' request for the corporate binder, for certain life insurance policies, and for information about the financial status of the corporation, Douglas retained an attorney who wrote a letter to John dated September 7, 2006 requesting the corporate record book, copies of certain insurance policies, and demanding $320,000 that had been taken from the Smith Barney investment account.

21.   From the evidence provided to the Court, it appears that the amount transferred by the Debtor to Tantamount from the Solomon Smith Barney account on the date that American's account  was closed by the Debtor was $362,760.45.  Douglas believes that much more had been taken from that account, but testifies that he sought only $320,000 in a bid for peace in the family.

22.   In response to the September 7, 2006 letter from Douglas' attorney, John had his long-time attorney provide Douglas' attorney with a document purportedly executed by both Douglas and John in December of 2005.  John's signature was acknowledged before that long-time attorney.    Douglas' purported signature was notarized by one James Deni, Jr., John's decades-long personal friend and pharmacist.  Mr. Deni was called to the stand by the Debtor and stood by his oath as a Notary Public, providing details of his present recollection of his having taken Douglas' acknowledgment of his signature.  Douglas denies ever having seen the document until it was provided to his attorney by John's attorney in the fall of 2006, and asserts that Mr. Deni is incorrect in his recollection.  Rather, Douglas asserts that his father was able to convince Mr. Deni to acknowledge Douglas' signature even though Douglas was not present and had not signed it.  A forensic document expert called by the Plaintiffs testified that it was "highly

probable" that the signature purporting to be that of Douglas Russo on that document was not inscribed by Douglas Russo's hand, as discussed in part B.(2), below.

23.  In this document (Plaintiff's Exhibit 3-5), John claims that <u>he</u> is the majority shareholder of American (not Douglas), and purports to transfer his shares to Douglas together with the sum of $70,000; John would assume responsibility for the payment of "the following debts of American, which had been personally guaranteed by Douglas but not by John"[8] (then reciting the existence of three loan accounts); American and Douglas would generally release John; but "Douglas shall never disclose to anyone or to any entity the indiscretion allegedly engaged in by John some twenty years ago.  In the event that Douglas violates this confidentiality provision, John shall be entitled to liquidated damages of $70,000 from Douglas.  The parties acknowledge that confidentiality is the essence of this agreement, and that damages to John flowing from a breach of this provision shall be difficult to calculate, but shall be substantial."[9]

24.  Importantly, this document purported to take effect only when and if  Douglas provided to John proof of the closing of the three recited loan accounts, and removal of John's name from certain utility accounts pertaining to the business premises.  Then John would remit the $70,000.

25.  The purported execution of the document in December of 2005 (if it happened) occurred within five months after John complied with Douglas' request to stop coming

---

[8]It seems, however, that  John had guaranteed at least the Key Bank loan, though that is not clear.

[9]The trial record contains no evidence of any "indiscretion" by John "some twenty years" before 2005.  At trial, Douglas denied knowledge of any "indiscretion" by John in the 1980s.

in to the office on a daily basis, but half-a-year before Douglas asked John to leave the business entirely.

25-A.  Douglas testified here that his signature was forged and Mr. Deni's recollection is incorrect.

26.  John Russo never took the stand here.  In closing argument he asserts that he paid the corporate debt[10] and utility and trade accounts that were listed in the agreement, but failed to pay the $70,000 and transfer his shares only because Douglas Russo violated the agreement by bringing suit in State Supreme Court and by alleging therein the mysterious "indiscretion" by John.

27.  Although it is clear and undisputed that this purported agreement was never fully consummated, the Debtor argues that any possible damages that this Court might award against him in favor of the Plaintiffs should be limited to the $70,000 and the transfer of stock.

28.  It bears repeating that Douglas not only claims that his signature was forged, but also that he never saw this document (supposedly subscribed in December 2005) until it was provided to his attorney by John's attorney (in the fall of 2006), in response to Douglas' demand for $320,000 and certain documents and (essentially) an accounting.  Again, it was in July of 2006 that John stopped coming to the business at Douglas' request.

29.  After John left in July of 2006, Douglas sought to unravel the financial status of American, and purports to have learned only then that American had several lenders who

---

[10]It seems to the Court that he reached settlements of those accounts only as to his personal guarantee or liability, and left the rest for payment by American and for Douglas (on personal guarantees that Douglas swears he never signed).  See footnote # 8 above.

claimed that American owed them money, and that <u>those</u> debts were based on what Douglas

testified were his forged signatures on loan applications, loan closing documents, grants of

security interests, and grants of Douglas' personal guarantee on some of these accounts.

      30.  It took some time for Douglas to complete his investigation. The state court

action was commenced on September 19, 2009 asserting that the total monies misappropriated

from the Plaintiffs totaled $897,368.81. The Complaint in state court also sought consequential

damages in the amount of $2.2 million.

      31.  After the present Chapter 13 case was filed in 2010, the Complaint was recast

and re-filed as a 11 U.S.C. § 523(a)(4) action in this Court. Apart from the routine denials and

affirmative defenses, the Debtor counterclaims. He reasserts that he is the majority shareholder of

American (see Finding 23 above), and complains of damage to him from Douglas' eventual sale of

the assets of American to an arms-length buyer for whom Douglas is now employed. Part

D.(1)(b) of this Decision explains the law that leads to this Court's finding that Douglas owns

95% of the shares of American, and the Court's conclusion that the counterclaims will be

dismissed to an appropriate extent.

      32.  Thorough discovery was undertaken and completed in the Adversary

Proceeding.

      33.  Trial took five days. On the first day, July 19, 2011, the Court heard

testimony from the Plaintiffs' forensic documents expert, Joan Winkleman, and from the tax

accountant for American and for the individual Russo family members, Joan Barton. Also,

Douglas Russo began his testimony.

34.   The Court finds that Ms. Winkleman's expert testimony is persuasive, and accepted for the purpose offered[11] - - "It is 'highly likely' that the hand that signed Douglas' name on certain key documents (discussed later) was not Douglas' hand."[12]

35.   The Court also finds that the testimony of Ms. Barton (the tax accountant) is totally worthy of belief and the Court adopts her testimony as "fact."  This Finding consequently rejects John Russo's  attacks upon her credibility in his Rule 2004 testimony under oath.  (This too will be more fully discussed below.)  (Transcript of July 7, 2010; pp. 63-71.)  The Court has observed her demeanor, considered her testimony and all of the pertinent evidence and finds that Plaintiff Douglas Russo is the 95% owner of American, and has been since 2000.   (Again, see Part D.(1)(b) below.)

36.   The next day the Court heard further testimony from Douglas Russo.

37.   The third day of trial was July 28, 2011, and began with testimony from Ronald Odessa, Sr., called by the Plaintiffs to describe the operations of a restaurant company of the name Belladesa's, Inc.  (The Debtor was the treasurer of that corporation, and the witness was the secretary of the corporation.)  The witness stated that during the period 2001-2004, the

---

[11]The Debtor objected to any conclusions that the expert reached regarding anyone's handwriting or signatures other than Douglas'.  The Court agrees so to limit the admission of her testimony and exhibits.

[12]The Debtor also objected to the expert's methodology in regards to her conclusions about Douglas' signature. The Debtor complained of an "inherent bias" in permitting Douglas to tell the expert which of many documents he gave her actually were signed by him, and which  were "questionable."  She explained that for her to witness current exemplars would not assist in analyzing documents executed years before.  Plaintiffs' counsel added that if the trial schedule had permitted, he would have called the expert after Douglas' testimony regarding those documents and signatures.   The Court agreed that the expert's opinion could not stand alone, in light of her methodology.  The subsequent testimony of Douglas did, in fact, provide the necessary tie-in.  Thus, the above finding is a combination of the testimony of the expert and the testimony of Douglas Russo.

Debtor handled the cash of the restaurant corporation.  The witnesses' son was the president of Belladesa's, and Douglas Russo was the vice-president.  The witness testified that he saw the Debtor sign Douglas Russo's name on checks.  Further, he testified that the Debtor once said to him "Doug just took out a loan and doesn't know it."

38.  Later during that day of trial, Mr. Odessa's son Ronald Odessa, Jr. took the stand.  He testified that he saw the Debtor sign Douglas' name at least a dozen or more times on Belladesa checks "and various bank documents."

39.  Ronald Odessa, Jr. also testified that he told the Debtor a few times that Douglas had to be the one to sign, and the Debtor would say "don't worry about it" or "Douglas doesn't know it."

40.  The next witness that day was Nicholas Falanga, a friend of the Debtor since 1959.  He described his role in assisting the Debtor to make an expenditure of American's funds that the Court finds to be a "trivial" matter.  (A $77 hotel bill.)  But more importantly, he testified that in September of 2006 (apparently after Douglas' lawyer's demand for $320,000), the Debtor told him about "problems with Douglas", and that the Debtor told the witness that he was thinking he would give $100,000 to Douglas, but would need some time to come up with it.[13]

41.  The next witness that day was Lori Wray, who was a bookkeeper at American from 2000 to 2007.  Called by the Plaintiffs, she described, among other things, the Debtor's bookkeeping practices at American and the relationship between the Debtor and Douglas.  She

---

[13]The Plaintiffs argue that  Mr. Falanga meant to say "the rest of it," meaning the full $320,000.  But that was not his testimony, nor was "the rest" mentioned in any affidavit.  The Court finds that John said to Mr. Falanga that he was trying to come up with $100,000.  It seems that this was a counter-offer.

supported Plaintiffs' allegations in regards to John's aberrant behavior, and John's failure to accurately record the payee or purpose of various checks on the check register.[14]  The Court accepts her testimony as "fact" in all regards.

42.  On the fourth day of trial, July 29, 2011, the Court heard testimony from Kathryn Jaszko who was called by the Plaintiffs to testify that when she worked at American she found discrepancies in the handling of the Belladesa's credit card, suggesting that money of Belladesa's was finding its way to American.  The witness testified that she warned Mrs. Odessa, and then was released by John Russo from employment at American.  The Court finds that she has testified truthfully.

43.  The next witness was called by the Debtor.[15]  This was Mr. Deni who testified (as noted above) as to his taking of Douglas Russo's acknowledgment of his signature on the stock redemption agreement in December of 2005.  (See Finding #22 above.)  The Court finds that Mr. Deni has testified truthfully.  Consequently, the Court will address Douglas' assertion to the contrary later in this Decision.

44.  The balance of the trial consisted of testimony by Douglas Russo.

45.  The Plaintiffs did not call the Debtor to the stand, but rather offered parts of

---

[14]The Debtor challenges her testimony at trial and  in closing arguments. Her uncle eventually purchased the assets of American, and Douglas now works for her uncle, under her supervision.  The Debtor obliquely suggests some sort of undisclosed business or personal relationship for which Ms. Wray would perjure herself for Douglas' benefit. The Court rejects this challenge as being totally without foundation in evidence, cynical, and morally offensive.  Ms. Wray was a plaintiff's prayer for a "dream witness" - - knows the facts, tells the truth, makes admissions against her own interests, acknowledges the limitations of her knowledge of the facts, does not evade any question, and will not be bullied by counsel.

[15]Witnesses were called out of order so as to accommodate their availability. This caused some discontinuities, such as is described in fn. 12 above.

his several days of deposition testimony. The Debtor's counsel properly insisted upon admission

of <u>all</u> of the several days of testimony. The Court agreed, and all of John's pretrial testimony is in

evidence here.

46. Other than Mr. Deni, the Debtor offered no witnesses, and he did not take the

stand in his own behalf.

47. The Court granted time for the preparation and submission of written closing

arguments. These were completed at the beginning of November, 2011 and the matter was then

taken under submission.


B.  Credibility of Witnesses, Additional Findings of Fact, and Conclusions of Law

(1) Rule 2004 Testimony of John Russo

As noted above, the Plaintiffs did not call John Russo at trial but instead

introduced the transcript of several days of his Rule 2004 and/or deposition testimony. And after

the Plaintiffs rested, the Defense (i.e. John) did not take the stand on his own behalf.

Examining the Debtor's sworn pre-trial testimony under oath, a clear and

consistent mind-set emerges, culminating in the following paragraph contained in his written

"Closing Statement" after trial. The subject primarily was the $362,760.45 moved by the Debtor

from the American account to Tantamount.[16]

**For Douglas Russo and American Legal and Commercial Printers,**

---

[16]It seems that the money was moved in 2001, four years before the falling-out between Douglas and John. However, if that money had been returned to American at some point, it is possible that this matter would not be before the Court.

**Inc. to succeed in showing that the monies in the Smith Barney account were corporate monies and not those of John Russo, they must show evidence of American Legal deposits into that account.  As American Legal never had a lump sum of money, this account could only exist by repeated periodic deposits by the company, if same occurred.  The reason the Plaintiffs cannot prove that fact is because it did not occur.  The monies found in the Smith Barney account that were placed in the name of American Legal were monies that came from John Russo.  It was John Russo's capital which he put in the name of American Legal so that the Company could secure bank loans and other financing that he later returned to himself as well he should.  The money in the Smith Barney account that existed under the name of American Legal came from the lifetime savings of John Russo and his wife.  John Russo and his wife did not scrimp and save all their working years so that Douglas Russo could scoop all of that money for himself.  That, in essence, is what Douglas Russo is attempting to do here.**

This is an incorrect statement of the facts.  John frequently made capital contributions to American that he eventually steered into the Solomon Smith Barney account, and then into his Nevada account  - Tantamount.  For example, in the transcript of the examination of John Russo on July 8, 2010, there was discussion of $30,000 that American Legal had borrowed from the City of Batavia, N.Y. and how that $30,000 came to be repaid.  That transaction had occurred in the early 1990s.  Beginning at page 6 of the July 8, 2010 transcript, Plaintiffs'

counsel asks John Russo about how he caused that loan to be paid off.  Counsel asked as follows:

    Q.  Would it be your recollection that you repaid the entire loan from your own funds, and that American Legal paid none of those - - paid none of the payments on that loan?

    A.  Well, what I probably did, this is going back 15, 20 years.  Probably put the money in American Legal to show that <u>American</u> <u>Legal</u> paid them off. [Emphasis added.] But American Legal had no sales, no nothing.

    Q.  Pardon me?

    A.  It had no sales.  I mean, it had no income.

    Q.  Okay.  So you would take your money - -

    A.  Right.

    Q.  - - put it in an American Legal account - -

    A.  Right.

    Q.  - - then American Legal would take the money that you put in the American Legal account - -

    A.  Because I wanted them to show that the <u>company</u> paid them back, you know. [Emphasis added.]

    Q.  I didn't quite finish my question.

    A.  Oh, I'm sorry.

    Q.  That's okay.  So you would pay your own money into an American Legal account, American Legal would then take the money you put into the account, and pay it

back to pay off the City of Batavia loan?

A.  Yes.

Q.  And this was a gift from you to your sons, essentially, or to American Legal?

A.  Well, it was investment money I put in.

Q.  Oh, so it was money you invested in the account?

A.  Well, I don't know what you want to call it . . .   Well, I am putting in, I call it an investment.  I mean, if I wanted to give them a gift, I would give them a gift.

Q.  That's what I wanted to know.  What was your intention at the time?  Were you intending American Legal would pay you back because you were investing?

A.  Yes.

Q.  Were you charging interest on this loan?

A.  No.

Q.  So it was interest-free loan?

A.  Yes.

Q.  Did you have an agreement, a written agreement, with American Legal with respect to these loans that you made?

A.  A written agreement?

Q.  Yeah, written.

A.  Not that I recall.

Q.  Did you have an oral agreement?

A.  More or less.

Q. What does that mean, "more or less?"

A. Well, they knew I was putting money in, that there would come a time when I would get my money out. The same with them, they put money in, they should get their money out. [Emphasis added.]

Later that same day, beginning at page 53 of the transcript, there was the following exchange:

Q. Now, when was it that you transferred the assets or that the assets were transferred from the American Legal Smith Barney account to the Tantamount account? When did that happen?

A. That was 2000 - - February of 2001, as far as I can remember.

Q. And what was the balance that was transferred?

A. I think $328,000 of my money.

Q. Oh, of your money?

A. Yeah, my money.

Q. Why was it your money?

A. Because I put in over $400,000 in capital. [Emphasis added.]

Q. Okay.

A. And I got the CPA's sheet, which I didn't bring.[17]

---

[17]This is a reference to Plaintiffs' Exh. 2-13 (not admitted into evidence, but admitted as Defendant's Exhibit D), which accountant Joan Barton testified she prepared at John's request to enumerate his "Capital Contributions" to American. As concluded in Finding # 35 above, the Debtor's rejection of her testimony as "false" only applies to the portions of her testimony that he dislikes.

Q.  And when did you put - - the best you can recall, when did you put in that $400,000 that you took $328,000 back on February - -

A.  <u>All through the years</u>. [Emphasis added.]

It is to be noted that the Debtor himself (a sophisticated businessman and investor) used the term "capital."  To the extent that he claims that the "$328,000" had never been American's working capital,[18] that claim is rejected.

At examination the next day, Plaintiffs' counsel attempted to determine what ultimately happened to the monies taken from Plaintiff American's Solomon Smith Barney account and put into Tantamount's Solomon Smith Barney account.[19]

Q.  Did you - - at some point in about 2008, did you close the Tantamount account?

A.  Yes, I think so.

Q.  How much money was in the account when you closed it in amount 2008?

A.  Nothing.

Q.  Pardon me?

---

[18]Indeed, from the <u>Debtor's</u> <u>own</u> <u>perspective</u>, he sought to <u>deceive</u> prospective lenders or customers into believing that American was well-capitalized.  Although this is not an action by a creditor so deceived, it is disingenuous for him to deny that it was corporate money.

[19]This is important because a <u>constructive</u> trust can be imposed upon assets diverted by a fiduciary and made subject to a "money judgment."

A. Nothing, as far as I know.

.......

Q. What had happened to change the value from $320,000 in 2001 . . . ?

A. Well, 2005 I was paying credit cards from American Legal and [Douglas] . . . . And, you know, everyday living credit cards. I would pay all of the expenses. [Note: It was in 2005 that the Debtor was asked to distance himself from the corporate-plaintiff.]

Q. So some of the money went back to American Legal and some of it went to pay for your own personal expenses; is that correct?

A. Yes, since it was my money, yes. [Emphasis added.]

Later during the examination, the Debtor corrected his testimony and indicated that at the time he closed the Tantamount account at Solomon Smith Barney there was more than $100,000 in the account which he transferred into an account at Raymond James Brokerage.

Q. Approximately what year did you do that?

A. End of '07.[20]

Q. Approximately ?

A. Approximately.

Q. And where was that Raymond James account? Was that in Batavia?

A. No, Lockport.

---

[20]This date was about a year after the September 6, 2006 letter from Douglas' former attorney demanding, among other things, $320,000.

Q.  And do you still have any money in that Raymond James account?

A.  No.

Q.  Where did that money go after it was placed in the Raymond James account?

A.  Well, the money was - - I tried to make money, then the market crashed and went down again.  I don't know.  I would have to find some of the papers.

. . . . . . .

Q.  So whatever you put in Raymond James, is it still in Raymond James?

A.  There is nothing in the Raymond James account.

Q.  Why is there nothing?  Did it drop in value completely?

A.  Yes  - - well, quite a bit.

Q.  Well, then, after it dropped quite a bit, what happened?  What did you do with what was left?

A.  Well, you know, pay credit cards, bills, everyday living.

Q.  So none of it - - am I correct in assuming that you are saying that none of it is invested in any way, it's all been dissipated.  Am I correct?

A.  That's correct.

[Transcript July 9, 2010, pages 8 through 18.]

During the rest of the July 9, 2010 pre-trial examination, John Russo was confronted with the affidavits and reports that later became the testimony of the handwriting expert, Joan Winkleman, C.P.A. Joan Barton, and Ronald Odessa, Jr.  He characterized as "lies"

and "absolute falsehoods" nearly every particular of the attestations of each of those people who became witnesses here at trial and whose testimony was the same here as it was in the reports and affidavits.

The pre-trial examination continued on September 10, 2010. Plaintiffs' counsel confronted John Russo with an Affidavit of Ronald Odessa, <u>Sr.</u> Again, John characterized the particulars of what eventually became the older Mr. Odessa's testimony before this Court as "absolute lies."

**<u>Finding of Fact #48.</u>**

**Because John Russo did not take the stand in his own defense at trial, the Court has never had the opportunity to observe his demeanor and assess his credibility while he called all of the testimony of the fact witnesses against him at trial "lies." The Court gives no weight to his protestations, and accepts the testimony of the above witnesses as truthful, and as "fact" for purposes of the trial record.**

Then in the pretrial testimony of John Russo under oath came the Affidavit of Nicholas Falanga with regard to the $77 hotel expense. During a discussion on the record between the two attorneys at that deposition under oath, Plaintiffs' counsel complained of the failure of the Debtor to provide books and records that had been demanded but never produced regarding much of his prior testimony. Beginning at page 37 of the transcript, Plaintiffs' counsel said:

So these are all issues that have to do with his misappropriation of funds

and the question of whether the funds - - his allegations to what money he has and

what money he doesn't have is all in question.  I understand this is only $77.80,

but the rest of the questions in here are much more relevant to this particular

action.  I mean, it is relevant.  I think it is relevant to this [Rule] 2004 action.  He

basically has already denied it, so I don't want to belabor that point, but the rest of

the allegations in here are very relevant to what's going on in this [Rule] 2004 - -

     THE WITNESS: It's my own money anyway.  [Emphasis added.]

     Mr. Fussell: It's expressly true in light of the fact that the records have all -

- we've asked for these records again and again; and he came in today, and, again,

didn't bring them.  Nobody produced them, they've evaporated, or whatever lame

excuses have been made again and again.  And its our duty to find out where this

money is and where the money from American Legal went.

     THE WITNESS: It's my money anyways.  [Emphasis added.]


     As to the signing of checks, the following exchange occurred in deposition, under

oath, on September 10, 2010, beginning at transcript page 79.

     Q.  Between 1991 and 2005, did you ever inform Douglas that you signed

checks with his name instead of your name?

     A.  He knew it all the time.

     Q.  How did he know it?

     A.  He got his check, he seen it.  It started out it was: Doug, you've got to

sign these checks; well, I'm too busy on the press, just sign my name.  Never once

did he ask me <u>not</u> to sign his name, never. [Emphasis added.]

. . . . . .

> Q.  Why did you use his name instead of your name?
>
> A.  Didn't we go through this before?
>
> Q.  I'm just asking: why did you sign his name instead of your name?
>
> A.  As a matter of convenience; I just told you.  He would have to stop the

press, come over and sign the checks, go back and start the press over again, get it

in balance.  And, then, the banks wanted - - in the beginning, when they were

young kids - - they were young when I started the business - - they didn't believe

that these guys were really working there.  They said: okay.  We want to see proof

that these guys - - they wanted their names on papers.[21]

The examination continued on September 24, 2010.  The following questions were

asked and answered (beginning at page 86 of the transcript).

> Q. . . .  Did you ever receive any income from any of your work at

American Legal either as treasurer, secretary, employee or anything of that sort?

Did you ever get paid income?

> A.  No.
>
> Q.  Okay, did you ever receive anything for any of the work you did for

---

[21]See text accompanying footnote # 2 above.  The Debtor has never explained why he thought that forging his sons' signature, as opposed to signing his name in his own script, with his permission, would not suffice.  The Court finds that he wished to deceive the business world, especially the lenders.  But it is not clear to the Court.

American Legal?

A. No. There was just, like, <u>return of capital</u> or something like that. [Emphasis added.]

Q. What do you mean "<u>return of capital</u>?" [Emphasis added.]

A. <u>Well, you put money into a corporation, say $50,000, but you've got a</u> <u>right to get that money back out.</u> [Emphasis added.]

Q. <u>But that was strictly like you said "return of capital?"</u> [Emphasis added.]

A. <u>Yes.</u> [Emphasis added.]

In sum, the deposition testimony of the Debtor fails to meet his burden of proof as a "fiduciary." As discussed in part C.(2) below, the burden starts with the Plaintiffs, but then shifts to the fiduciary.

**Finding of Fact # 49.** The Debtor has repeatedly admitted that the monies he infused in American were capital contributions. (Although he now calls them "interest-free loans.") He had a fiduciary duty to the corporation and to Douglas Russo as a shareholder, to account with regard to these funds. He failed to do so in a manner that would win discharge as to the $362,760.45. That resolves the matter of the Solomon Smith Barney account.

His testimony regarding his signing of Douglas Russo's name on corporate <u>checks</u> now will be discussed more fully in connection with this Court's assessment of the credibility of Douglas Russo.

(2) Credibility of Douglas Russo

The Debtor argues that (1) it is not possible that Douglas Russo was unaware that John regularly signed and imitated Douglas' name on checks from the time that Douglas became the corporate president until John's departure in 2006; (2) consequently, Douglas has lied under oath here; (3) the doctrine of "*falsus in uno, falsus in omnibus*" must apply, and thus (4) the Court should not credit any of Douglas' attestations that he was unaware of John's other activities undertaken by using Douglas' name or American's name (for example, loan documents, and the transfer of funds in the corporate Solomon Smith Barney account), or Douglas' testimony that his signature was "forged" on the documents that were essential to carry out those other activities.  (Even as to John's signing of Douglas' name on personal guarantees of corporate obligations.)

The Court agrees that Douglas' testimony in important regards is "unreliable." But the Court does not find it to be knowingly false.

In deciding whether to apply the doctrine here, the Court notes the difference between "positive testimony" and "negative testimony."[22]  Douglas' testimony with regard to John's imitation of Douglas' signature on everyday checks is best captured by his testimony on cross examination, during the fourth day of trial.  Pressed by the Debtor's counsel, Douglas made the following statements - -

- "I did not know John signed my name, ever."

- "I never saw my paycheck that wasn't <u>un</u>signed." [Emphasis added.]

---

[22]See, for example, 29 Am. Jur .2d Evidence § 1368, focusing, however, on the relative probative value and weight of competing testimony of two witnesses, one of whom is providing "positive testimony" and the other of whom is providing "negative testimony" as to the same issue.

- "I never saw checks written to suppliers, lenders, etc."

- "No one ever mentioned it to me."

- "I never once saw that he was signing my name."

- "Nobody ever told me."

These are statements of what he never saw, never heard about, and consequently never knew. "Negative proof." And there is no witness to the contrary - - "positive testimony."

There is no doubt in the Court's view that Douglas "could" have known about John's practice. And perhaps he "should" have known about John's practice if he knew anything about his duty as president of a Sub-S corporation.

The Debtor called no witness to testify to any occasion on which John's practice of signing Douglas' name was pointed out to Douglas, or on which Douglas indicated any awareness of that practice. Rather, each of the several witnesses called by the Plaintiffs, which witnesses were familiar with this practice, testified affirmatively that they never told Douglas about it. By their testimony, they considered it to be none of their business. They just didn't think about it, considering it to be, perhaps, an understanding between the father and son.

Next, there is no hint or suggestion in the trial record to the effect that Douglas had any reason to question his father's handling of the books and records of the corporation. To the contrary, two or more of the witnesses who had worked at American testified that Douglas idolized his father and trusted him beyond cavil. This, combined with the undisputed testimony (including John's own deposition testimony) to the effect that Douglas also did some check signing, leads the Court to believe that to the extent that Douglas saw his own simulated signature

on checks that he himself might not have signed, it simply did not strike him as a matter to imprint on his memory as he might have if he had actually witnessed John signing checks with Douglas' own name (which Douglas swears he never witnessed).

Again returning to the Latin maxim, Black's Law Dictionary definition states that the maxim is "the principle that if the jury believes that a witness' testimony on a material issue is intentionally deceitful, the jury may disregard all of that witness' testimony." It is this Court's view that in order to be "deceitful" one must "know" that one is distorting the truth. In testifying as to "a negative," the pertinent dictionary definitions of the word "know" are these: "1. To perceive or understand as fact or truth; to apprehend clearly and with certainty: (or) 2. To have established or fixed in the mind or memory . . . ." [Random House Unabridged Dictionary 2nd Ed. (1993).]

**Finding of Fact # 50.** The Court concludes that Douglas' testimony that he was unaware that John Russo signed Douglas' name on company checks was not clearly false, and, in any event, was not so "intentionally deceitful" as to warrant the application of the doctrine so as to exclude all of Douglas' testimony.

**Finding of Fact # 51.** That said, the Court finds that Douglas' testimony as to check-signing is "unreliable' and so dismisses all of the portions of the Plaintiffs' complaint that depend upon whether it was John or Douglas who put Douglas' signature on any particular check. To a limited extent, it is the Sherlock Holmes story of "the dog that didn't bark." It seems that there are checks upon which Douglas knows that his name was "forged," but he doesn't complain of those. Maybe it was a payment on his car, or a car payment for Lori Wray.

The following is the Court's analysis of the conflicting testimony.  It is what the Court finds to be "more probable than not," for purposes of the "fair preponderance standard."

Until John left the business at Douglas' request in 2006, Douglas never paid attention to how the corporate checks were signed and he did not care.  He signed many checks and paid no attention to what signature his father applied to other checks, which were most of American's checks.

After John left and Douglas began learning of the dire finances of American (and himself) at his father's hands, Douglas focused on the signature matter.  Eventually he hired an expert.  Although the expert properly cast her findings as "probabilities," they became "certainties" in Douglas' mind.  Consequently, they became absolutes in Douglas' testimony.

Moreover, the <u>only</u> regard in which John's Rule 2004 testimony will be credited by the Court is his testimony on September 10, 2010, Transcript p. 79, recited above:

"Doug, you've got to sign these checks.   [To which Doug supposedly replied.] Well, I'm too busy on the press, just sign my name."

When the Court puts these facts together it concludes that <u>as to corporate checks</u> (1) Plaintiffs have not proven by a preponderance of the evidence that the Debtor diverted corporate funds to non-corporate purposes punishable under 11 U.S.C. § 523(a)(4) (i.e. the "business judgment rule"), or that (2) John's imitating Douglas' signature on corporate checks was culpable under that statute.  After all, John could have signed his own name, and there would be no § 523(a)(4) culpability so long as a corporate purpose was served.

C.  Additional Conclusions of Law

(1) Debtor Owed a Duty of Trust to American and to His Other Shareholders, as a Matter of Law.

American is a New York corporation.  Consequently, New York Law governs the duty of its directors and officers.

Much of the development of New York jurisprudence regarding this issue has developed in the context of solvent, valuable, closely-held corporations.  Consequently, the focus in those cases is upon the duty to shareholders rather than the duty to the corporation itself.  For example, in the case of *Schwartz v. Marien*, 37 N.Y.2d 487 (1975), the New York Court of Appeals considered the case of a shareholder who sued directors of the corporation alleging that they violated their fiduciary duty to her when they sold shares of treasury stock to themselves and to two corporate employees without at the same time granting her the opportunity to purchase treasury stocks on the same terms in proportion to her stockholding.  The Court of Appeals stated that "members of a corporate board of directors . . . owe a fiduciary responsibility to the shareholders in general and to individual shareholders in particular to treat all shareholders fairly and evenly . . . Stockholders . . . have . . . rights . . . which arise out of the fiduciary or trust relation which directors and officers sustain to stockholders, which imposes upon directors and officers as fiduciaries the duty not to use their position for their own personal advantage or for that of their confederates or to the detriment of stockholders.  In other words, even where statutes or articles of incorporation have abolished the stockholders' pre-emptive right there is still a fiduciary principle which protects the stockholders." [Citations omitted.]

The United States Court of Appeals for the Second Circuit (which binds this Court) addressed the duty in a very different factual context, but its ruling was not dictum because it was essential to the holding.  In *Gully v. National Credit Union Administration Board*, 341 Fed.3d 155 (2003), that Court considered whether the Credit Union Board correctly found that the defendant breached her fiduciary duty as the manager of a federally insured credit union, and was, therefore, unfit to be involved in the affairs of such a credit union.  That Court stated that the New York standard that was to be applied by the Board is this:

> **Under New York law, a director or officer of a corporation owes a fiduciary duty to the corporation.  See New York Business Corporation Law § 715(h) (corporate officer "shall perform his duties . . . in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."   New York Courts have long held fiduciaries to a standard "stricter than the morals of the market place.  Not honesty alone, but the punctilio of a honor the most sensitive, is . . . the standard of behavior."  *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (1928) (Cardozzo, C.J.).  A corporate officer's fiduciary duty includes discharging corporate responsibilities "in good faith and with conscientious fairness, morality and honesty in purpose" and displaying "good and prudent management of the corporation."   *Alpert v. 28 Williams Street Corporation,* 63 N.Y. 2d 557, 569, 483 N.Y. Sup.2d 667, 473 N.E.2d 19 (1984) . . . .  New York's fiduciary law is therefore consistent with the standard used**

**by the Board in its decision."**

Obviously, the United States Court of Appeals for the Second Circuit has also addressed this important issue in very large cases. In the case of *Hanson Trust PLC, et al. v. ML CSM Acquisition, Inc.,* 781 F.2d 264 (1986), the court considered a fight over a tender offer regarding a large publicly-traded corporation. The corporation was the much-diversified corporation that originated in Smith Corona Typewriters. The question, which the Circuit described as "the second suit arising out of an intense struggle for control of a large public corporation," was as follows.

The entire board of directors and (allegedly) entities controlling the corporation were sued for the steps that the directors took to avoid a "hostile takeover." At issue before the Circuit was the question of whether the directors had a safe haven in the "business judgment rule." That holding has little application in this particular fact pattern, because there has never been any record of any meetings of the board of directors in the present case. However, the Circuit Court that binds this Court stated this:

**SCM is a New York corporation, and no party disputes that the acts of its directors are to be considered in light of New York Law. Under New York Corporation Law, a director's obligation <u>to a corporation</u> and its shareholders includes a duty of care in the execution of directorial responsibilities. Under the duty of care, a director, as a corporate fiduciary, in the discharge of his responsibilities must use at least that degree of diligence that an "ordinarily prudent" person under similar circumstances**

**would use.  See N.Y.S. Bus. Corp. L § 717.**

(Then the Circuit went on to address the application of the "business judgment rule" in the case before it.)

The highest court of the state of New York said in the case of *Alpert v. 28 William Street Corp.*, 63 N.Y.2nd 557 (1984) "because the power to manage the affairs of the corporation is vested in directors and majority shareholders, they are cast in the fiduciary role of 'guardians of the corporate welfare' . . .  In the disposition of trust, they have an obligation to all shareholders to adhere to fiduciary standards of conduct and to exercise their responsibilities in good faith when undertaking any corporate action . . .  Actions that may accord with statutory requirements are still subject to the limitation that such conduct may not be for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the stockholders. . . .  The fiduciary must treat all shareholders, majority and minority, fairly . . . .  Moreover, all corporate responsibilities must be discharged in good faith and with "conscientious fairness, morality and honesty in purpose" . . . .  Also imposed are the obligations of candor . . .  and of good and prudent management of the corporation . . . .  When a breach of fiduciary duty occurs, that action will be considered unlawful and the aggrieved shareholder may be entitled to equitable relief. [Citing, among other authorities, *Pepper v. Litton*, 308 U.S. 295)]."

Here, the defendant was the founder, director, shareholder, and secretary and treasurer of the corporation and even was the president, according to the corporate books that he

had the duty to maintain.[23]  The fiduciary duty for purposes of 11 U.S.C. § 523(a)(4) could not be clearer.[24]

Both American as a corporation and Douglas as a shareholder of American are proper party plaintiffs under 11 U.S.C. § 523(a)(4).

(2)  Burden of Proof.

It is well-established since the U.S. Supreme Court decided, in *Grogan v. Garner*, 498 U.S. 279 (1991), that in a 11 U.S.C. § 523(a)(4) case, the creditor must first prove by a "fair preponderance of the evidence" that the debtor owed a fiduciary duty to the creditor and that the creditor suffered a loss at the debtor's hands.

Further, if the fiduciary duty is not an "express trust" duty (such as pursuant to a trust instrument), the creditor must establish that the duty of trust at issue is not merely a "constructive trust," such as a trust "*ex maleficio.*"  It must be shown to be, for example, a statutory trust.  (See such cases as *In re Sullivan*, 217 B.R. 670 and the numerous authorities and decisions cited in that decision.)  (This Court has addressed this issue in the discussion immediately above.)

Then the burden shifts to the debtor (see, for example, *In re Otto* (9th Cir., 1997), 106 F.3d 1456), and the measure then also is "fair preponderance."  There is some debate as to whether it suffices for the debtor to show that the breach of duty was not intentional, as opposed

---

[23]See Finding #4, above.

[24]Indeed, even if there were no corporation, the duty of trust existed in the close familial relationship.  See N.Y.Jur.2d, Trusts § 172.

to a "*per se*" view that even an inadvertent or negligent defalcation results in non-dischargeability.

(See *Sullivan*, and *In re Johnson*, 242 B.R. 283 (Bankr. E.D. Pa., 1999) and authorities cited

therein.)  But this Court need not enter that debate as to the $362,760.45 that this Debtor took

from Plaintiff-American's account, and never returned.  See *In re Moreno* (5th Cir. 1990) 892

F.2d 417.)  He did so knowingly and by design, by his own admission, as found above.

### D.  Ultimate Conclusions as to $362,760.45

By his own pre-trial testimony, admitted into evidence at trial, the Debtor took the

money intentionally simply because he felt that it was "his money."  However, this Court has

found that it was corporate capital.

Assuming arguendo that that was a sincere belief by the Debtor that it was "his

money," the Court concludes as a matter of law that that would not place that defalcation beyond

the reach of 11 U.S.C. § 523(a)(4) even under the more forgiving interpretation of that statute.

As found above, the Debtor was sophisticated; he caused American to be formed as a *de jure*

New York corporation; he caused Tantamount to be formed as a *de jure* Nevada corporation that

he alone could control; although the evidentiary record is not clear (because the Debtor has not

provided important records), it seems that he absconded with the Tantamount funds only after the

falling-out with Douglas in 2005.  This was an intentional conversion of corporate money in

hopes that he could "get away with it."  His self-serving claim that he always thought that it was

"his money" that he could take when he wished, and that this was understood by Douglas, is

rejected.

The Court concludes under applicable law and under the facts as found that the

Plaintiffs have carried their initial burden as to $362,760.45; that the burden shifted; and the Debtor failed to sustain his burden; and that non-dischargeable money judgment shall enter against the Debtor in that amount.

(1) Judgment

Now the question of who shall be the judgment creditor or creditors here.

(a) Generally, the Debt is Owed to American.

This case is unusual in that American is not a Debtor under Title 11, U.S.C. If it were, the non-dischargeable money judgment would belong to the bankruptcy estate of American for the benefit of its creditors, and any surplus would go to its shareholders.

Here, it appears that the Debtor has settled his personal liability on American's debt and that Douglas has resolved, or continues to resolve, his personal liability upon the corporate debt. Because American is not a Debtor, the Court has no idea what it might still owe.

Importantly, Douglas asserts 95% ownership of American, and the Court agrees, as discussed below. Consequently, the Court concludes that the judgment for $362,720.45 must enter for the corporation, and to the extent that $362,720.45 exceeds any remaining debts owed by American, Douglas is entitled to 95% of any surplus.

(b) Douglas Owns 95% of American as a mixed Question of Law and Fact.

Here, in New York, - - the cradle of corporate America - - it would be nice if there were a clear rule as to corporate ownership. For example, "the corporate records control" or "the stock certificates control," or the federal tax returns control.

Regrettably, New York law is not that clear.

The Court upholds Douglas' claim to 95% ownership of American because it is said that "Since no certificates of stock were [properly] issued . . . [25] we may consider other evidence to determine the validity of [plaintiff's] claim . . . [of ownership of stock]. *Blank v. Blank,* 681 N.Y.S.2d 377 (3rd Dept.) 1998, which court examined, among other things, tax returns, to determine who actually were shareholders.

Similarly, see *Hunt v. Hunt*, 636 N.Y.S.2d 804, and *Markman v. Exterior Delite*, 831 N.Y.S. 2d 656 (2006).

This Court rules, as a matter of law, that when a party accused of a fiduciary fraud committed upon a closely-held corporation was statutorily-charged to maintain the corporate record book, and failed to do so, he may not rely upon the corporate records to deny shareholder status to a plaintiff claiming to be a shareholder.  Rather, the Court may examine all other evidence and may grant to the plaintiff such status as the evidence establishes.  Here the Debtor acknowledges 5% ownership by Douglas, but claims 55% ownership.  That claim is rejected in light of the testimony of the accountant, and Douglas, and the pertinent tax returns that were prepared by the accountant solely upon the financial information provided by John.

Consequently, the Court upholds this suit by American against John.  John may not avail himself of the view that Douglas, as president, may not cause American to sue its majority shareholder.  (N.Y.Jur.2d Business Relationships §§ 663, 664) John is not the majority shareholder.  The bizarre stock certificate (Def.'s Exh. C) is of no weight.  It was never recorded

---

[25]"Properly" is added by this writer, in light of John's failure properly to maintain the corporate records (See Finding of Fact ## 3 and 4.)

in the corporate books that John, as corporate secretary was duty-bound to maintain; the transfer

information on the back of the certificate was grossly incomplete, and was uncertain as to the

extent of the purported transfer; and when the burden of proof shifted to John, he failed to call

Brian to the stand to support the supposed transfer.

(c) The Non-Dischargeable Money Judgment Runs First to the Creditors of

American, and Then 95% of Any Surplus, to Douglas.

The BCL is clear.  Shareholders are subordinated to creditors. [N.Y.B.C.L. § 510]

Because American is not a debtor here, it is unclear to the Court whether

corporate debt remains, or how it now might be paid.  Consequently, the Court Orders that the

money judgment be entered in favor of "Douglas Russo as President of American Legal

Commercial Printers, Inc."

Part E.  Douglas' Claims Personally Against the Debtor, and Douglas'

Claims for Corporate Debts Already Paid by Douglas.

The fact that money judgment now enters against John in favor of American is of

little benefit to 95% shareholder Douglas if that judgment is uncollectible by and from American.[26]

Furthermore, none of the above discussion addresses the personal guarantees that Douglas claims

were imposed upon him (for American's debts) by his father's alleged forgeries.  Douglas has paid

substantial sums upon those guarantees.

Consequently, the Court turns to that matter.

---

[26]In other words, if the money judgment for American is uncollectible from John, or if satisfaction by John leaves no surplus for Douglas, then Douglas is aggrieved.

The Court has found above that Douglas' testimony regarding the signing of checks is "unreliable." Consequently, the complaint is dismissed as regards "forged" checks from American's checking accounts. Plaintiffs have failed to establish that any such disbursements lacked a "corporate purpose." The same is concluded as to the corporate loans that the Debtor caused <u>American</u> to incur.

But the allegedly "forged" <u>personal</u> guarantees obligating Douglas are a different matter. Even if they too may have served a "corporate purpose," the resulting personal liability to Douglas cannot be ignored.

Without further information that must be developed in light of the above holdings, it is unclear to the Court whether there still exists an issue directly as between Douglas Russo as Plaintiff, and the Debtor. Douglas personally claims by two routes: (1) Officer and shareholder in American, and (2) an individual made personally liable on corporate debts by his father's "forgeries."

If the money judgment now to be entered in favor of American were to be collected and were to be sufficient to satisfy all remaining corporate debt in full, there might be a surplus sufficient to reimburse Douglas for all that he has personally paid pursuant to the guarantees. That might resolve some of Douglas' compensatory claims against the Debtor.

Because this is a Chapter 13 case, the Court finds it to be in the interests of judicial economy to direct the Debtor either to file a modified Chapter 13 Plan that properly recognizes the non-dischargeable debt that will now enter, or convert to Chapter 7 and let a Chapter 7 trustee investigate the "lost" $362,760.45, and any other funds.

Of course, the Debtor may also choose to ask the Court for leave to dismiss the

Chapter 13 case.  Though the court might grant such leave, it will not do so without first

adjudicating the rest of the 11 U.S.C. § 523(a)(4) claims before it, so that these matters will be

laid to rest as to liability, amount, and dischargeability, in the form of a final monetary judgment.

Although the Court has not resolved all the claims presented here, the Court finds,

under Rule 54(b) of the Federal Rules of Civil Procedure, that there is no just reason for delay in

entering final judgment as to fewer than all claims presented for the following reasons.

First, entry of the $362,760.45 judgment (if it becomes final and is collectible),

might fully resolve this case, as described above.

Second, if it is not collectible (and if a chapter 7 trustee so confirms) then

judgment in a higher amount might be superfluous, and might be conceded by the Debtor or

waived by the Plaintiffs.


<u>Conclusion</u>

The Debtor's disbursements by check are non-actionable for want of proof that

they did not serve a corporate purpose and, if "forged" by the Debtor, for want of proof that that

was not a practice permitted by the Plaintiffs.

Absconding with $362,760.45 was a culpable breach of fiduciary duty, not

dischargeable under 11 U.S.C. § 523(a)(4).  That breach damaged the corporate plaintiff

primarily, and the other shareholder (the individual Plaintiff) secondarily.

The individual Plaintiff (Douglas Russo) owns 95% of the corporate Plaintiff, and

is entitled to 95% of any surplus after satisfaction of corporate debt.

Direct claims by Douglas Russo against John Russo, arising out of alleged forgeries of Douglas' signature on personal guarantees of corporate debt are not adjudicated at this time.

The Clerk shall now enter money judgment against the Debtor and in favor of American Legal in the amount of $362,760.45. Added to that will be pre-judgment interest at the lawful state rate, upon that amount.

The balance of this Adversary Proceeding is restored to the Calendar for report on **May 16, 2012 at 11:30 a.m.**

In the meantime, the Debtor shall, within 30 days of the date of this Decision, file a modification of his Chapter 13 schedules and Plan, to recognize the aforementioned non-dischargeable debt of $362,760.45 debt, if such a plan is feasible. If it is not feasible, then the case will be converted to Chapter 7, so that a Chapter 7 Trustee may pursue assets, if any.

Any voluntary dismissal of this case by the Debtor will not affect this Court's current judgment, nor its jurisdiction to decide any remaining issues and enter a supplemental judgment.[27] Dismissal of the underlying Chapter 13 case does not affect matters that came to judgment today or that will continue. "Dismissal" does not mean "closing" of the case.

The Trustee's long-standing Motion to Dismiss this case is now, *sua sponte*, deemed to be a Motion to Convert this case to Chapter 7. It is next scheduled for **April 10, 2012**

---

[27]Such would require an adjudication of the claims remaining in this Adversary Proceeding, especially Douglas' personal claims against John, particularly the alleged "forgeries" on guarantees by Douglas.,

**at 1:00 p.m. in Batavia, New York**, but will be heard on **May 8, 2012 at 1:00 p.m.**

        The parties are cautioned that the Debtor has scheduled significant debts to creditors other than these Plaintiffs.  Under applicable law, the fact that today's judgment is non-dischargeable does not permit confirmation of a Chapter 13 Plan that causes other creditors to suffer in order to favor a non-dischargeable debt that (like this debt) is not also a debt entitled to "priority" under 11 U.S.C. § 507.  To the extent that other creditors would suffer, any settlement must focus upon the future _after_ the "mandatory repayment period" required by the Code, although the $362,760.45 judgment (plus interest) may share with other non-priority creditors, _pari passu_, _during_ the mandatory repayment period.

        SO ORDERED.

Dated:      Buffalo, New York
            March 20, 2012

                                   s/Michael J. Kaplan

                                 _____
                                       U.S.B.J.